Good morning, counsel. Two cases. Thank God it's Friday. We have read your briefs. The authority cited in your briefs. We've looked at the record. So you don't have a lot of time this morning. Please feel free to get straight to the heart of your argument. We're probably going to have some questions, but be mindful of the traffic lights when the red light shines. It's time to stop. If you're answering a question from us, though, you're on our time. And that would not cut into any rebuttal time if you haven't. We're going to begin this morning with Mercola v. The New York Times. Mr. Earley. May it please the Court. Good morning. I'm Eric Earley, attorney for plaintiff and appellant Dr. Joseph Mercola. This case involves two statements published by The New York Times which defame Dr. Mercola. The district court made several errors in dismissing his complaint without leave to amend, all of which should be reversed. Let me ask you about something that was briefed, but did not get as much attention in the brief and about which I think there are some mistakes in both briefs. That is the pre-suit notice requirement. And I understand there's an argument by The New York Times that service means it can't be by email, and you dispute that. But if I understand it, your email notice that you say was sufficient occurred on July 15, 2023. Had to be five days, as I understand it. That's a condition precedent for the suit and is substantive for purposes of Erie. There does not appear to be any dispute between the parties about that. So the real question is how to count. It seems to me there are two different kinds of counting rules that might apply. One is the federal rule, Rule 6. The other is the Florida rule in Section 770.01. In both, you count backwards. So we would count from Friday. And if we count backwards, and you don't count Saturday, Sundays, or legal holidays. So you start on Thursday. Wednesday would be two. Tuesday would be three. Monday would be four. You sent the notice on Saturday. That's a Saturday. So it had to have been Friday. It seems to me you've only got four days, not five. Well, Your Honor, unfortunately you went right to the math questions. And as you've heard from attorneys before, that's not why we became attorneys. Your brief, both briefs counted forward instead of backwards. But your brief said . . . your brief started, you recognized the Saturday issue and you started Monday. So you counted Tuesday as day one, but you said Friday would be day five. Well, even under your own counting rules, that's wrong. If Tuesday is day one, Wednesday would be day two, Thursday would be day three, and Friday would be day four, not day five. So either way, it seems to me you're wrong. Your Honor, I will incorporate everything we say on page 20 of our answering brief, but we do say that you can serve on Saturday. But Saturday doesn't count because it's a weekend. The email service suffices, as we argued pursuant to the . . . I'm going to give you that. I'm going to give you that the notice was sufficient in the email. I'll give you notice. I'll give you credit that it can be by email. I'll give you the benefit of both of those arguments. You still lose. We served on Saturday. Five days begin on Monday, July 17th. The lawsuit was filed the fifth day, July 21st. You count backwards, not forwards. That's what the rules . . . either the Florida rule or the federal rule requires. Let's go backwards from Friday. The first day you count under the counting rules then would be Thursday, 1, 2, 3, 4. You needed to get that notice on Friday, but you gave it on Saturday. Your Honor, we do count Friday, but we count from Monday, the first day that it would have been effective if it served on Saturday, Monday 1, Tuesday 2, Wednesday 3, Thursday 4, Friday July 25th . . . July 21st. Can you tell me a rule that . . . can you point me to a rule where you count forward instead of . . . Okay. Maybe you can figure it out on rebuttal. That's the problem I'm having. If my reading of this is right, either rule, federal rule or Florida rule, then it seems you've got a big problem. I would also say, Your Honor, there was not an ounce of prejudice to the other side with respect to this situation. Condition preceding, as I understand it, that it doesn't matter under the law. Would you like me to get into the merits? You can go . . . I think we've explored that as much as we can. Well, let me ask one follow-up question on that. Your client emailed the Times about the second statement back in 2021. Are you counting that as any sort of precinct notice? Could you please ask that again, Your Honor? Your client emailed the New York Times about statement two back in 2021, about two years before you filed suit. Are you asserting that we should be looking at that as any sort of pre-suit notice? Well, given the discussion I just had with the Chief Judge, I would definitely ask you to take that into account, Your Honor. This case involves two false statements in which my client, Dr. Mercola, was defamed. It goes back to July 2021 with the Biden administration and news outlets like New York Times using their vast power to cause Americans to get COVID-19 vaccination. Dr. Mercola, a widely recognized and influential osteopathic physician, published . . . Let me interrupt you because you're going to run out of time if we spend time on the background facts, which you should assume that we know. On statement one, just to make sure that I understand, is your client only depending on a defamation claim based on the literal meaning of that statement, or are you saying that statement one can be read to imply that your client purposely lied about the efficacy of the COVID vaccine? Literal and implied, Your Honor. And I want to be very clear, that statement, unlike every argument that's come our way with respect to statement one, does not require the court to get involved or engage in a scientific debate. Can you explain why statement one is reasonably capable of bearing the implied meaning you're asserting? Yes, Your Honor. Easily disprovable. The word easily is really the key word here. That's got to be opinion, the word easily. Excuse me? That's got to be opinion. Well, no, Your Honor, it does not in the context of this article and in the context of the way it was stated. There were no facts here given in this article. Whether something is easy or not, though, is just not something, it seems to me, that can be anything but opinion. Well, Your Honor, when we come to the question of opinion, I think it's best to look at the case on what's an opinion for purposes of a defamation case, which is the Supreme Court's Milkovich case. And in that case, a statement is actionable, not opinion, if it asserts a demonstrably false fact. And here are the key words, subject to objective verification. So your problem that the word easily or disprovable, I mean, again, the article, as I read it, cites to several experts, cites to other studies, even the link to the study. There was an allegation that it didn't identify Mr. Mercola as the author, but they put a link to the study, and he's clearly listed in that link as the lead author. So what is, again, false? Your Honor, the problem here is, or one of the main problems here, is the case, unlike other cases that were cited here, for example, the Malone case, et cetera, there were no other studies, no other factual opinions provided by, or factual statements provided by other doctors and other scientists. And there was all kinds of evidence. We've seen it in their own answer brief in this case. There are other things that could have been included in this article as to why Dr. Mercola's that the vaccine did not prevent transmission and did not prevent infection. There are all kinds of facts available at that time that could have been included in this article. And frankly, there was all kinds of other evidence that could have been included in the article that supported Dr. Mercola. Then we wouldn't be here arguing. The problem is, is they cut off debate with this. They stopped Dr. Mercola in his tracks. This, frankly, was an article, a character assassination piece that made Dr. Mercola look like a quack. And if we're talking about having free and robust debate in this country, then we cannot use a few words and the stroke of a pen to silence somebody like a Dr. Mercola. I took up a lot of your time. I want to make sure my colleagues don't have any more questions. You save some time for rebuttal, Mr. Early. Why don't we hear from Mr. Michigan? Good morning, Your Honor. May it please the court. Max Michigan from Ballard Spar on behalf of the defendant, Eppley, the New York Times Company, with me today is my colleague, Charles Tobin. Can you help me with the counting rule? Sure. Well, you know, always sitting, waiting, and hearing the first thing is that both briefs contain a mistake is immediately, okay, what's it going to be? And to hear, like my friend said, that it's a math mistake is, I think, the... It's really counting backwards instead of forwards. Right. Now, I take Your Honor's point, and what I would say is that whether you count backwards or forwards, you get to the same result of the Saturday email was untimely because Saturday doesn't count. So I think I agree with if Your Honor... Seems like there's an additional failure that they didn't even allege compliance with this. That's correct. It is an element of a claim in Florida.  And that's a conceded failure. The plaintiffs throughout briefing have conceded that they did not even allege to satisfy the condition precedent. So you moved forward with defending the lawsuit, so is there any law that allows the state to waive, the defendant to waive that notice requirement? And the district court addressed it in a footnote and moved to the merit. So is there any law to support the district court's ability to discount or ignore that notice requirement? I'm not aware of any authority that says that that notice requirement can be waived. I would certainly say that the Times has raised it at every stage of the litigation in our motion to dismiss. And again, on appeal, I suppose there would be an argument that because the issues that we're talking about today on things like opinion and defamation by implication involved the First Amendment, there would be arguably a constitutional avoidance question that would encourage the court to reach the non-merits issue of satisfying a state law condition precedent before having to reach the constitutional merits issues of whether statement one is an opinion, statement two is capable of a defamatory meaning. So no, I don't think it's been waived. I think that the Times has asserted it repeatedly and forcefully. And the district court noted correctly in the footnote that the failure to satisfy the condition precedent was conceded. It wasn't even an attempt made. But my question is, was it therefore improper for the district court to move on to the merits and address the notice issue simply in a footnote? I don't think it was improper in the same way that it wouldn't have been improper for the district court to address. We've briefed five arguments why the complaint fails to state a claim. The district court addressed two of them and didn't. It's a merits failure either way. So the district court can address any reason why the suit should be dismissed. This is just one reason. That's correct. And because your honors can affirm on any basis present on the record, the district court's decision to address the merits of statement one and statement two certainly does not preclude you from finding that independently and alternatively plaintiff failed to satisfy the condition precedent. But if he failed to satisfy it, then we don't have to address anything else either. I agree, your honor. And like I said, I think that the constitutional avoidance would even encourage you to say that if you can resolve this case entirely on the condition precedent, that that's what you ought to do. What do we make of the 2021 email? Well, I think that the chief judge sort of spotted, my friend, the argument that email counts. We dispute that. The statute on its face says that retraction demand. Suppose we disagree with you and think email counts. What do we make of the 2021 email? Sure. If you start from the position that email counts, then that 2021 email certainly satisfies the timing condition. But what it doesn't do is it doesn't identify statement one as a challenge statement. So you're left with only statement two in suit. And specifically, the version of statement two as published in the original report, we noted in our briefing that for the first time on appeal, plaintiff is attempting to allege some kind of defamatory meaning out of the out of the updated version of statement two. That would certainly be out. We would be, you know, your honors would be present before you would only be statement two and only as it originally appeared in the publication. And I'm in that case, I'm happy to sort of start with statement two and work backwards on this before I work. They argued that that that 2021 email satisfied it. They did raise that below. So I'm not going to say that they have waived that argument. But I just didn't remember it being the only brief I remembered them addressing this issue at all with great. Well, yes, I mean, and your honor, as you may know, in the district court below, there unusually for the middle district, both reply and disreply that focused largely on the retraction statute issue. So these issues . . . I was just wondering if they raised it before us. I can pull that up. But what I would say is that if we're talking about statement two and only about statement two, then I think the district court got it entirely right. That is statement two reasonably read by an ordinary reader and in the context of the Rubin versus U.S. news is not capable of defamatory meaning as a matter of law. Or at the Times to say, you know, John Smith said X. We were unable to verify X does not reasonably imply that John Smith is lying. That is, it says something about the Times. It doesn't say anything about the person whose statement is . . . And in the context of an article that does say negative things about him, the fact that they did not go the step of saying this was false as opposed to other claims that were easily disprovable, right? That's exactly right. It suggests just that, that the Times was unable to say that it was false. That's exactly right. And that was the district court's reasoning as well is that one of the context clues we can glean from the remainder of the article is that the Times had no problem pointing out what it viewed as errors or misinformation that Dr. Merkel had been chastised by the FDA or the FTC about. So, right, an ordinary reader reading the statement two in the context of the entire article would draw the conclusion that we were unable to verify means exactly what it says. The Times was unable to verify. So that's the literal meaning. Are you, you're, you're asserting though that statement two carries no innuendo or implication that Merkola lied about his authorship of the study? That's right. Not, it doesn't, it doesn't reasonably, you know, subject to a reasonable interpretation, it doesn't convey that implication, Your Honor. And . . . Well, you say that he never addressed whether his coronavirus claims were factual. You then say that the Times wasn't able to prove it. And then you cite, I think it is a reasonable argument, mostly to other experts who also don't agree with Dr. Merkel's position, but there doesn't seem to be a lot of expert information from those who do. So I think that also could suggest that it was, it was biased. I'm sorry, that the Times' statement that they were unable to verify was biased? The Times' statement that he didn't, he wasn't able to address the, whether his statements were factual, that the Times also wasn't able to verify the statements, and then the context of the whole article doesn't, the argument is that it doesn't therefore present experts who could support his position, and that put together suggests that he was lying. Well, I would say there's two responses to that. One is that, um, the, you know, the lack of expert support for Dr. Merkel's position may reflect a lack of expert support for Dr. Merkel's position. That's, that's one thing, um, you know, that the Times certainly did, like, as you said, include quotes from other experts on, you know, uh, vaccination and, and on the spread of COVID information. Um, the second thing is that, you know, the, the only authority is that we've been able to find on the specific phrase, unable to verify, agree with us that that particular phrase doesn't reasonably convey that what you're unable to verify is lying. The, what you're unable to verify is a lie. And if, if I could zoom out for a second, you know, we, we count on . . . The only ones you found were the, um, Northern District of Illinois and the California Court of Appeals decisions, is that right? That, that is correct, Your Honor. Those were the only cases we've been, we've been able to find that directly address whether that phrasing carries any kind of defamatory implication. But, you know, if you open the newspaper or, or go to your news website of choice, I think you'll find the phrase, you know, we were unable to confirm, we were unable to verify, you know, we were unable to reach for comment. These are stock phrases in journalism precisely because we count on journalists to report on claim, a claim that somebody is making, a claim of a new medical discovery or a new invention. It may well be newsworthy and we expect that journalists are going to, you know, signpost for readers what, what the, the journalists have been able to confirm and what they haven't. And to, to put, put journalists to their peril by saying, well, if you, if you tell, if you tell your readers that this is what somebody says but you're unable to confirm it, um, if that conveys a defamatory implication, I think what you're going to see is that news organizations, there was no requirement for the Times to include Dr. Mercola's statement at all. They could have, if they said, look, we can't verify this, we're not going to publish it, right? He claims he's an author, but we can't verify it. We're going to leave it out of the article. I don't, that doesn't advance. Instead, what he got was he, he, he was able to have the New York Times report that he had, uh, he was the lead author in a peer-reviewed study that showed that, uh, and the alternative was, you're saying that wouldn't have been reported at all if, if, if, if the New York Times can't put that in context and say, look, we, we, we were unable to verify. That's exactly right. And so, you know, to the extent that what Dr. Mercola is seeking expressly and falsely is, is a robust and, and, you know, a debate about science and, you know, developing science, I think, uh, encouraging journalists to report claims that are being made and to, you know, disclaim to readers what they can and cannot verify, uh, advances exactly the sort of First Amendment goals that, that Dr. Mercola and the Times both, uh, you know, both believe in here. If we were to find that statement two implies that Mr. Mercola, um, uh, lied about his research and publication, do you concede that implication? Not in the context of the article as a whole. Because what, you know, if, if you agree with Dr. Mercola on the implication of statement two, then that directly raises, uh, the argument that we briefed below and, and before this court on, uh, material falsity, which is to say under Florida's material falsity rule set out in Smith v. Cuban American, what you would do is you would say, okay, well, here's the challenge statement, statement two, Dr. Mercola reads it to imply that he is misleading on the science. Let's see what, what's the gist of this article? This is the article whose gist is that Dr. Mercola is the leading spreader of misinformation. You would read the article and then you'd read the article again with the statement missing and you would see whether there's any difference in gist between those two readings. Uh, you, you, you get that, that, uh, test from. Do you have a case that says we, that we should, um, remove the statement and read the article as a whole without it to compare to the article with the statement? Absolutely, Your Honor. I have two cases for you. One is Smith v. Cuban American from, oh, I'm sorry, it's Smith v. Cuban American National Foundation at 731 Southern 2nd, 702. That's from the third DCA. And the other case right here from the 11th circuit is Berisha where, uh, you know, this court in Berisha, uh, noted two alleged falsities in the, the arms and the dude piece that was at issue and said, you know, uh, these, you know, these alleged falsities, even if you were to remove them from, from the piece, don't change the gist of what the piece says. And therefore there's no material falsity. So I think that, you know, even if you were to credit Dr. Mercola's, uh, interpretation of statement two, it doesn't get him past the material falsity argument that we've set out. And then of course, independent of that, you have a lack of a plausible allegation of actual malice. Um, you know, in, in this case, the, you know, the arguments that Dr. Mercola has made about actual malice are precisely the arguments that this court has rejected in Michelle, in Turner, um, in, in, uh, in the Moore case, most recently, which I understand Your Honor was on the panel for. Um, you know, these are the same stock allegations of actual malice, uh, that there was ill will or there, you know, there was a failure to investigate or, you know, that they could have done more. Um, those are simply not, you know, there's, there's ample case law at this point that those are not, uh, sufficient to nudge a claim of actual malice across the line from possible to plausible in the language of Iqbal. Uh, if, if there are any other questions on, on statement two or the, I'm conscious of my time. Use your time as you've got a minute. Well, thank, thank you. I, what, what I would just conclude then by saying is I'll finish where I started, which is to say, oh, thank you. My colleague pointed out that his opening brief doesn't address the 2021 email and neither does his reply brief. So I do think that, you know, I'll argue below was not raised on appeal. And to that extent, your, you know, Your Honors could certainly find that the, the 20, an argument that the 2021 email satisfied, uh, requirement has been forfeited. That's right, Your Honor. I listened to your argument the other day in the, in the Markle case, I understand the, you know, forfeiture and waiver are, you know, they're, they're tough, they're tough and strong medicine, but they're the prescribed medicine, no pun intended. Um, and so I think in this case that, that might be the cleanest way to resolve the case. It would avoid sort of the, you know, any constitutional first amendment questions and for constitutional avoidance purposes, that, that might be precisely the way for Your Honors to go. If there are no further questions, I'll. Thank you. Thank you. Mr. Early, you've saved five minutes. Thank you, Your Honor. Uh, not to get into this math forever on this case, but, um, I'd like to read you a statute that, uh, we firmly believe, uh, means you start counting from day one, you don't start counting backwards. Florida Rule of General Practice and Judicial Administration 2.514A, it's, uh, called computing time. Uh, and then you go, that's a small a computing time, then one, a large a begin counting from the next day. That is not a Saturday, Sunday or legal holiday. That's what we did here. Served by email on a Saturday, started computing and counting from Monday, but Your Honor, I'd rather, uh, get into now the rest. That rule 22.514A5 says you count backward when the period is measured before an event. It's before Friday. That's what we're counting. Your Honor, with respect, with respect to statement number two, yes, we incorporate, Your Honor, uh, what was, uh, what was in the briefing below with respect to the previous notice with respect to statement number two, unable to verify absolutely provably false statement. New York Times had in its hands when it said that the actual, uh, the actual, um, uh, peer reviewed article. Okay. Uh, they knew at the time they said it was unable to verify that they could have verified it. Any way you look at that statement and any way you, you deal with it, Your Honor, if I may. The trouble with that I have is that, that, that, um, that assumes they've got all the time in the world. Just, just because they were unable to verify it before publishing their story does not mean that if you gave them a year, they wouldn't, they wouldn't be able to verify it. It just says we were unable to verify it. Your Honor, when you, when you look at this in the gist of the entire article, this was a character assassination piece to shut him down. When you look at unable to verify, especially at the time when they had the darn article in their hands, it just further made it look like Dr. Mercola said that he published this peer reviewed piece on COVID-19 and guess what? We can't verify it. We, the New York Times, the vaunted New York Times cannot even verify that he published this. This whole thing set out to make him look like a quack and to stop and to stop debate at the end of the day. But then they updated the article and included a link to the study. Now there could be an interpretation that they weren't able to verify the claims in the study and then someone goes to the study and disagrees with the Times. Is that a false statement or just a difference of opinion? A false statement again, Your Honor, based on the update that they did that they were unable to verify the claims in the study. With the link to the study, right? With the link to the study. This is a peer reviewed study. The thing about that is, unable to verify the claims would mean you would need to go behind the peer reviewed study to see, you know, was it in fact peer reviewed? You know, these authors who are listed on the link, are these the authors? There are a lot of things the New York Times could do to verify that and the fact that they didn't do that doesn't say anything defamatory about your client. It just says something about the New York Times that they didn't do that. Your Honor, I respectfully disagree with that interpretation. Perhaps that's one interpretation, but there are many interpretations to the viewers out there and who knows if they tried to verify or not. We'd like to get into what their subjective knowledge at the time was, but before you unable to verify in the context of an article like this, then go out there and try and verify. Let's see what they did. Let me ask you this. They've cited two decisions, the California and the Illinois decision. Do you have any case law that would suggest that an unable to verify statement could be defamatory? We don't, Your Honor. The fact of the matter here is the two cases that were relied on by the Times, which the court unfortunately appeared to take just directly what they said, the district court. This Kazin case, it's an unpublished non-citable case. It has nothing to do, nothing, zero to do with this. You have a state farm adjuster calling up GEICO to find out if somebody was insured and GEICO says, we're unable to verify if they're insured. It was a truthful statement in that case. Then I'm out of time, but Swanson is similarly completely distinguishable. Your Honors, at the end of the day, from a public policy standpoint, I'll make this real quick. What makes it completely distinguishable? The Swanson case? Yeah. In Swanson, the Baker firm was called about a former employee who worked there 17 years ago to say by a new prospective employer, did she work here? The firm said, we don't keep records that far back. We are unable to verify if she works here. That's all it said. There was no harm and oh, by the way, it was the absolute truth. Has nothing to do with this. Yeah, but I mean, they could have gone and worked harder and found employees who worked there at the time and asked, do you remember him? I mean, I don't see how that's distinguishable. Your Honor, 17 years earlier, there was no harm whatsoever to the plaintiff in that case. The statement at the time was absolutely true. They searched the facts of that case show. The prior firm searched their records. They could not find the other record that she worked there. They said, we're unable to verify. Where's the evidence here that the New York Times searched and saw whether or not they could verify the doctor's claims? We would like to find that in discovery. And frankly, we're entitled to see that in discovery, Your Honor. And briefly, from a public policy standpoint, I'm going to end this by saying, all we want is a debate. And this article at a very, very intense time in the history of the world, frankly, when a doctor came out with a statement that actually, in hindsight, proved truthful, but was completely against what the administration wanted and what the New York Times and others wanted to say that this vaccine does not prevent infection or transmission. They shut him down. They make him look like a fool. And it was using the pen of the New York Times to assassinate someone's character. And we've seen this, unfortunately, very recently right now to see other public debate completely shut down in this country. That's all we ask for. Okay. I think we understand your case, Mr. Early. We appreciate it. We're going to move to our next one. Thank you very much. Thank you. Somehow, we have a tendency to save our last, save our hardest cases for last. Remember. Associated.